**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND**

| | |
|---|---|
| **THERESA HENSON,**<br>**2217 ASHBURTON STREET**<br>**BALTIMORE, MARYLAND, 21216**<br><br>**Individually and on behalf of the Howard County General Hospital, Inc. 401(k) Plan, and on behalf of all the similarly situated participants and beneficiaries of the plan,**<br><br>    **Plaintiff,**<br><br>  **v.**<br><br>**HOWARD COUNTY GENERAL HOSPITAL, INC.**<br>**5755 CEDAR LANE**<br>**COLUMBIA, MARYLAND 21044,**<br><br>**John and Jane Does 1-30 in their capacities as fiduciaries,**<br><br>  **Serve on Registered Agent:**<br>  **Cogency Global Inc.**<br>  **1519 York Road**<br>  **Lutherville, Maryland 21093**<br><br>   **Defendants.** | **Case No. 1:26-cv-1172**<br><br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

1. Plaintiff Theresa Henson ("Plaintiff"), individually, and on behalf of all other similarly situated participants, their beneficiaries and estates, and on behalf of Howard County General Hospital, Inc. 401(k) Plan ("the Plan"), brings this action under 29 U.S.C. §§ 1132(a)(2) and (3) against Defendants Howard County General Hospital, Inc. (the "Company"), and John and Jane Does 1-30 in their capacities as fiduciaries ("Doe Defendants") (collectively, the Company and the Doe Defendants will be referred to as "Defendants" or "Fiduciaries"), to remedy

1

Defendants' breaches of fiduciary duties and other violations of the Employee Retirement Income Security Act of 1974, as amended (ERISA), 29 U.S.C. § 1001, *et seq*.

2.      Defined contribution plans that are qualified as tax-deferred vehicles have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance of pension plan assets used to fund defined benefits, defined contribution plans operate in a manner by which participants bear the risk of high fees and investment underperformance.

3.      As fiduciaries to the Plan, at all times relevant to this Complaint Defendants were obligated to act (1) prudently and (2) for the exclusive benefit of participants and beneficiaries. Defendants violated their fiduciary duties by both (1) initially selecting; and (2) consistently retaining the American Century Target Date Fund for years, even when it glaringly underperformed under all investment metrics and, consequently, in terms of returns. This lower-performing investment option reduced Plan participants' retirement funds by millions of dollars as compared to if Defendants did not breach their fiduciary duties.

4.      Plaintiff brings this action to obtain the relief provided under 29 U.S.C. § 1109, for losses suffered by the Plan resulting from the Defendants' fiduciary breaches described below, and for other appropriate equitable and injunctive relief under 29 U.S.C. § 1132(a)(3).

**II. JURISDICTION AND VENUE**

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(2).

6.      Venue is proper in this judicial district pursuant to 29 U.S.C. § 1132(e)(2) because Defendants reside in this District (in Columbia, Maryland), and the breach of fiduciary responsibility occurred in this District.

## III. THE PARTIES

7.      At relevant times, Plaintiff by virtue of Plaintiff's former employment with the Company and participation in the Plan, is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches of fiduciary duty and ERISA violations.

8.      Thus, Plaintiff is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

9.      At relevant times during the Class Period, Plaintiff was invested in the American Century One Choice target date fund series.

10.     As a result of the Defendants' mismanagement of the Plan and violations of ERISA, and in particular Defendants' inclusion of the American Century One Choice target date fund series, Plaintiff was subject to underperformance and suffered financial losses.

11.     At all relevant times, the Company was and is incorporated in Maryland with its with its principal office located at 5755 Cedar Lane, Columbia, Maryland. The Company has over 2,000 employees at its Johns Hopkins Howard County Medical Center location.

12.     At all relevant times the Company was and is the named fiduciary and sponsor of the Plan per 29 U.S.C. § 1002(16)(B) and 29 U.S.C. § 1002(a); a party in interest under 29 U.S.C. § 1002(14)(C); and a Plan fiduciary under 29 U.S.C. § 1002(21)(A), to the extent that it appointed members of the Committee and co-fiduciaries and otherwise exercised discretion over the administration and management of the Plan and/or control of Plan assets.

13.     At all relevant times, the Doe Defendants, as fiduciaries, were fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A), to the extent that they had or exercised discretionary authority

respecting the administration or management of the Plan, and/or control of Plan assets. Plaintiffs will seek leave to amend the Complaint to name each of these John Does once their identities are ascertained in discovery. At all relevant times, each Defendant was one or more of the following: a party in interest under 29 U.S.C. § 1002(14)(A); a Plan fiduciary under 29 U.S.C. § 1002(21)(A), to the extent they had or exercised discretion over the administration or management of the Plan and/or control of Plan assets; and/or (3) a named fiduciary under the Plan.

### IV. THE PLAN

14. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A), a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and a qualified plan under 26 U.S.C. § 401(k).

15. The Plan was established to provide eligible employees with the opportunity to accumulate retirement savings over a long period through the sum of employee and employer contributions and associated investment earnings minus associated expenses.

16. The Plan is a defined contribution plan covering all eligible employees of the Company and participating subsidiaries. Participants of the Plan can elect to make tax-deferred contributions upon eligibility.

17. The Defendants control and manage the operation and administration of the Plan. The Defendants have fiduciary responsibility for the investment of the assets of the Plan.

18. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).

19. From the beginning of the Class Period[1] to 2024 the Plan managed assets ranging between $153 million and $188 million. As of the end of 2024, the Defendants managed over $188 million in Plan assets for over 2,800 active participants.

20. Upon information and belief, in light of the large size of the Plan and the vast resources of its Fiduciaries at all times relevant to the Class Period, the Plan had access to a wide array of plan investment options and Defendants had the ability to investigate and monitor the Plan's investments.

## V. DEFENDANTS' FIDUCIARY OBLIGATIONS

21. ERISA imposes strict fiduciary duties upon the Defendants as fiduciaries of the Plan, including the duty of prudence. These duties apply to all fiduciary acts, including the Defendants' selection and retention of investment options for the Plan.

22. ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(B).

23. As part of its fiduciary duty, the Defendants "ha[ve] a continuing duty to monitor [Plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id*. at 530. If an investment is imprudent, Defendants "must dispose of it within a reasonable time." *Id*. (citation omitted).

---

[1] As used herein, "Class Period" refers to the six years prior to the filing of this complaint.

24.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.

25.     Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.

## VI. FACTUAL ALLEGATIONS

### A.  Defendants Violated ERISA's Fiduciary Duty of Prudence.

#### a.  Background on Target Date Funds

26.     In a recent report to Congress, the U.S. Government Accountability Office ("GAO") noted that Target date funds (TDFs) are widely offered and have become the most popular investment option used by 401(k) plan participants.[2] TDFs allocate assets over time based on participants' targeted retirement dates. Plan sponsors often choose TDFs as their default investment because TDFs offer a "set it and forget it" option for participants.

27.     The investment objective of a target date fund series is to provide an asset allocation strategy that changes its asset allocation over time as investors get closer to their expected retirement date. The name of each fund in a target date series typically refers to its target date, which corresponds approximately to the investor's anticipated retirement date. For example, a fund with a name like "Retirement Fund 2040" or "Target 2040" is designed for individuals who intend to retire in or near the year 2040. Target retirement years are often offered in five-year increments. The specific retirement date of a fund in a target date series is often referred to as a "vintage." For example, funds in a target date fund series for plan participants expected to retire around 2040

---

[2] Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024),  https://www.gao.gov/assets/870/868017.pdf (last accessed February 19, 2026).

would typically be referred to as the 2040 vintage of that series while the fund in a target date fund series for plan participants expected to retire around 2030 would typically be referred to as the 2030 vintage target for that specific target date fund series.

28.     American Century Investments ("AC") is an investment management company that created and manages the American Century One Choice target date fund series (hereafter "AC TDF"). Like most target-date fund series, the AC TDF is structured as a "fund of funds," which means that each vintage invests in other American Century proprietary funds rather than individual securities. For example, each vintage in the AC TDF may be invested in differing proportions of proprietary AC equity funds, bond funds, real estate funds, and money market funds. In other words, each vintage of the AC TDF invests in a combination of proprietary AC mutual funds to provide varying exposure to a mix of asset classes such as U.S. stocks (large-caps and small-caps), international stocks, U.S. bonds, international bonds, investments linked to real estate, and cash-equivalent securities. These asset classes can be further categorized generally as allocations to equities or as allocations for fixed income.

29.     Each equity allocation is intended to provide exposure to a specific market segment. Typically, those segments include U.S. large-, mid- and small-capitalization companies and international (non-U.S.) developed and emerging markets. The portfolio manager's aim should be to build a portfolio that provides exposure to factors commonly tied to a stock's potential for enhanced risk-adjusted returns relative to the market.

30.     Each fixed income allocation is intended to provide diversified exposure across a wide range of market sectors, including U.S. government obligations, corporate investment grade and below investment grade bonds (commonly known as "high yield bonds" or "junk bonds"), other U.S. aggregate bond sectors (including mortgage- and asset backed securities), and emerging

market and international fixed income issues. The portfolio manager's aim is to provide broadly diversified fixed income exposure and construct a portfolio to enhance issuer diversification and liquidity.

31.     Under ERISA, the asset allocation for each vintage of a target date fund series is required to be consistent with the prudent investor standard which incorporates Modern Portfolio Theory ("MPT").

32.     TDFs seek to achieve their objectives by rebalancing assets over time to become less focused on growth (lowering their allocation to stocks) and more focused on preservation (raising their allocation to bonds) as the fund approaches and passes the target date. The asset mix between equity and fixed income shifts dynamically over time, becoming less risky over a person's working career and into retirement. The transition from higher risk to lower risk is often referred to as the "glide path."

33.     For example, Figure 1 below illustrates Morningstar's calculation of the average glide path over time from 2010 to 2024.

**Figure 1**



34.    TDF glide paths are often categorized as managed either "to" or "through" retirement. In general, historically a "to retirement" glide path generally assumed participants withdraw their funds once they reach the presumed retirement age, or soon thereafter, and tend to have less equity exposure at retirement. Similarly, in general, the asset allocation of a "to retirement" TDF historically remained static once the retirement date is reached. A "through retirement" glide path generally expects participants will remain invested after reaching retirement and gradually draw down on their funds. Accordingly, the terminal allocation of a "through retirement" TDF is not reached until a predetermined number of years after the target date.

---

[3] Morningstar 2025 Target-Date Fund Landscape, April 2025, page 24.

35.    However, these distinctions and categorizations are somewhat arbitrary. In fact, for example, some "to retirement" glide paths, like the AC TDF series, have more equity exposure at retirement than some "through retirement" glide paths. Moreover, as illustrated in Figure 1 above, over time most retirement plan asset managers have understood that, under the circumstances prevailing prior to and at the start of the Class Period as well as now, static asset allocations for plan participants around age 65 are less consistent with Modern Portfolio Theory.

36.    Further, while TDFs are sometimes considered differentiated by whether they consist of index (passive) funds or active funds, in fact all TDFs are actively managed because of the continuous work of shifting the asset allocation of each vintage along the glide path.

37.    Accordingly, as described below in more detail, the minimum standard of care for prudent plan fiduciaries making investment decisions under the prudent investor standard requires a fiduciary to consider investment options other than only a small subset of the available options when selecting or monitoring a target date fund series.

38.    Additionally, while the specific details of glide paths vary somewhat across different TDF series, they are all constrained by Modern Portfolio Theory and, as a result, they all compete with each other for investment dollars. Over the years, it has become clear that some glide paths are better than others. This is illustrated by the change in the average glide path illustrated above as well as net fund flows out of inferior glide paths and into superior glide paths.

39.    Further, because most plan fiduciaries designate the selected TDF as the qualified default investment alternative ("QDIA") under ERISA, the TDF selected by a plan fiduciary will typically contain the lion's share of the assets of most plan participants. For this reason, the selection of a TDF series as the QDIA by a plan fiduciary is often the most important and impactful of all its investment selection and monitoring responsibilities.

10

40.     For example, in this case the AC TDF comprised between 56% and 58% of the Plan's assets from 2020 to 2024.

41.     Unlike most of the equity and fixed income asset categories that comprise the underlying investments contained in TDFs for which there are often several scores of alternatives, there are far fewer TDF options. For example, in 2024, there were only 37 established TDFs that had a 15-year track record. A closer look reveals that, as shown in Figure 2 below, assets are highly concentrated in the top 5 largest TDFs, which accounted for 80% of all TDF-invested dollars as of 2024, and that among these top 5, the Vanguard TDF series contains more than double the assets of the next largest TDF series.

**Figure 2**



Source: Morningstar Direct and surveyed data. Data as of Dec. 31, 2024.

[4]

---

[4] Morningstar 2025 Target-Date Fund Landscape, April 2025, page 13.

42.     The significant market share among TDF market leaders is primarily the result of investors moving away from clearly inferior TDF products, like the AC TDF chosen by Defendants in this case, and into superior alternatives. The net flow into a particular target date series is the sum of contributions from existing investors, withdrawals from existing investors, and the net result of transfers by fiduciaries from one inferior target date series to a new superior target date series. Investors and plan fiduciaries have been making decisions that indicate they have concluded that the AC TDF is inferior. For instance, in 2024 the AC TDF series experienced net outflows of almost $4B. This represented a loss of more than 19% of its total assets under management. In contrast, for example, the American Funds/Capital Group target date series experienced over $16B in net inflows.

43.     As noted above, all TDFs compete for selection by plan fiduciaries and are compared against each other despite some slight differences in glide paths. Unlike the mutual fund market, the TDF market is too small and concentrated for plan fiduciaries to fail to compare their selected options against the market leading and established available options. In other words, while there are some differences between, e.g., the T. Rowe Price and Vanguard TDFs, prudent fiduciaries compare and consider these two as well as other options when making their selections and deciding whether to retain or remove a selected TDF series. Further, over time as prudent fiduciaries have continued to evaluate and analyze the differences in the glide paths of each TDF series, the superior glide paths have attracted more assets and most TDFs with underperforming glide paths have revised their glide paths to be more like the superior options. In other words, over time the variance between the glide paths of the TDF series have decreased and those that continue to be outliers have experienced underperformance.

12

**b. The Standard of Care for Prudent Fiduciaries Selecting and Retaining a TDF Series**

44. ERISA's fiduciary duty of prudence requires that fiduciaries must act in accordance with the prudent investor standard when making decisions related to plan investments. This means that in order to be prudent, fiduciaries are required to follow accepted investment theories and prevailing investment industry practices. *Tibble v. Edison Int'l*, 575 U.S. 523, 529-30 (2015). For the last several decades, the most accepted investment theory is the Modern Portfolio Theory ("MPT") which has been incorporated into the prudent investor standard.

45. A prudent TDF selection and monitoring process considers a wide array of metrics commonly accepted and incorporated in MPT that allow the fiduciary to properly assess the prudence of any potential TDF series.

46. A prudent process considers all the metrics and circumstances present at the time of the selection/retention/removal decision in order to evaluate whether the TDF should be selected or retained.

47. Accordingly, the minimum standard of care for prudent plan fiduciaries selecting and retaining investment options to be made available for plan participants always requires an analysis of the risk-adjusted performance of the selected or retained investment options.

48. While the selection of a target date series is a bit more complex than the selection of a single-strategy investment option, retirement plan experts have also developed a minimum standard of care with respect to the selection and retention of target date series.

49. The most critical criteria for selecting and retaining target date fund series are performance, risk (which incorporates risk-adjusted performance), fees, and the "glide path" dynamic asset allocation (also sometimes called "portfolio construction"). These quantitative criteria are also supplemented with some qualitative criteria that are often merely proxies for an

increased risk of future underperformance, e.g., a change in the investment manager's ownership or key personnel, a shift in the investment manager's philosophy or process, or the investment manager's involvement in litigation or fraud allegations.[5]

50.    In other words, the qualitative criteria primarily provide reasons to not select (or eliminate) a TDF series from a plan even if performance was good at that moment. At the end of the day, however, risk-adjusted performance is the primary and most important criteria. Even the fees are essentially a proxy for performance because lower fees correlate with higher performance.

51.    And of course, the actual performance of an investment is the most important criteria to the investor (plan participant) and is accordingly always considered when evaluating a target date series. And because each target date series might incorporate a glide-path that takes on relatively more (or less) risk, the risk-adjusted performance metrics are relatively more important for comparing and benchmarking target date series.

52.    As discussed above, when evaluating the risk-adjusted performance and quality of investment managers, the minimum standard of care for prudent plan fiduciaries incorporates standard metrics from MPT. The most important of these criteria include, but are not limited to, the following metrics over three- and five-year trailing periods:

- Alpha:  A measure of the difference between a portfolio's actual returns and its expected performance, given its level of risk as measured by beta. A positive Alpha indicates the portfolio has performed better than its beta would predict.

---

[5] *See* Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), p. 50, https://www.gao.gov/assets/870/868017.pdf (last accessed March 20, 2026); *See also* CAPTRUST's "Best Practices for Target Date Fund Selection, https://www.captrust.com/wp-content/uploads/2019/05/tdftips.pdf (last accessed January 20, 2026); Callan Institute, Defined Contribution Trends Surveys 2017-2020, 2022.

In contrast, a negative Alpha indicates the portfolio has underperformed, given the expectation established by beta.[6]

- Sharpe Ratio: A risk-adjusted returns measure developed by William Sharpe. The Sharpe Ratio is calculated over each time period by dividing a fund's annualized excess returns by the standard deviation of a fund's annualized excess returns to determine reward per unit of risk. The Sharpe Ratio can be used to compare two funds directly on how much risk each had to bear to earn excess return over the risk-free rate.[7] Notably, American Century identifies the Sharpe Ratio is a meaningful investment metric in its marketing materials. *See* https://www.americancentury.com/advisors/client-conversations/target-date-solutions/one-choice-target-date-portfolios/ (last accessed February 20, 2026) ("Portfolios with higher Sharpe Ratios tend to provide more return for the same amount of risk as portfolios with lower Sharpe Ratios").

- Sortino Ratio: Similar to the Sharpe ratio, the Sortino Ratio (developed by Frank Sortino) uses only the downside risk portion of the standard deviation in the denominator.[8]

53. Some other relevant metrics include the following:

- Information ratio ("IR"): a metric that helps the investor evaluate whether the manager of the investment is beating a specific benchmark. An IR above 1.0 is

---

[6] *See* Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), p. 70-1, https://www.gao.gov/assets/870/868017.pdf (last accessed March 20, 2026)

[7] *See id.* at 71.

[8] Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), p.71, https://www.gao.gov/assets/870/868017.pdf (last accessed March 20, 2026).

evidence of excellent performance with consistent outperformance of the specific benchmark; an IR between 0.5 and 0.99 is evidence of reasonable manager skill; an IR of below 0.5 is evidence of weak performance as compared to the specific benchmark; and a negative value IR is evidence of consistent underperformance relative to the benchmark.

- Batting Average ("BA"): is a measure of a manager's ability to consistently beat the market. It is calculated by dividing the number of months in which the manager beat or matched the fund's primary benchmark index by the total number of months in the period. For example, a manager who meets or outperforms the market every month in a given period would have a batting average of 1.000. A manager who beats the market half of the time would have a batting average of .500.

- Turnover Ratio: is the percentage of a mutual fund or other portfolio holdings that have been replaced in the course of one year. Since a fund with a higher turnover ratio will have higher trading fees and short-term capital gains taxes, a portfolio manager with a higher turnover ratio will need to ensure that those trades are generating positive returns in excess of the additional costs.

54.    Additionally, the minimum standard of care for prudent plan fiduciaries selecting and retaining a TDF series requires a comparison of the risk-adjusted performance.[9] In other words, to satisfy the minimum standard of care under the circumstances then prevailing both prior

---

[9] *See* 29 C.F.R. §2550.404a-1 ("Investment Prudence Duties" shall include, but is not necessarily limited to "[a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties) or menu, to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action compared to the opportunity for gain (or other return) associated with reasonably available alternatives with similar risks.")

to and throughout the Class Period, a prudent fiduciary should have considered a comparison of available peer alternatives.[10]

55.     Accordingly, a prudent plan fiduciary, when determining whether to retain a Target Date Fund series, would evaluate and compare the performance and commonly accepted investment performance metrics such as the ones identified above to meaningful benchmarks including at the very minimum the industry leading peer alternative target date options.

56.     Prior to and throughout the Class Period prudent plan fiduciaries had access to a tremendous amount of information to evaluate the performance of the AC TDF series in comparison to the industry leading alternative options.

57.     Additionally, the prudent evaluation process requires an evaluation of all various "preferences" with respect to various target date fund series. In other words, the selection of a "through" versus a "to" TDF series or an "active" versus a "passive" TDF series is a fiduciary decision in and of itself. Similarly, the selection of a TDF series incorporates and requires the selection of the glide path of that TDF series which is also a separate fiduciary decision in and of itself. Arbitrary limitation to only consider "to" or "through" options, or only "active" and not "passive" is imprudent.

58.     For instance, hypothetically, if all "passive" TDF series consistently underperformed all "active" TDF series then it would be imprudent to limit the selection process to "passive" options because there may be something inherently imprudent in the universe of "passive" options. The same goes for choosing a "to" TDF series versus a "through" series. Moreover, there is a lot of overlap in the glide paths of "to" versus "through" glide paths and since

---

[10] *See*, the Target Date Benchmarking section of the Callan Institute, Defined Contribution Trends Surveys 2017-2020, 2022.

many of the categorizations are arbitrary, a prudent fiduciary would consider the entire universe of TDFs as opposed to a limited subset.

59.     Accordingly, a prudent plan fiduciary is required to evaluate not only whether a particular preference is prudent under the circumstances then prevailing but also whether specific options that incorporate or do not incorporate those preferences are prudent. In other words, a prudent plan fiduciary would be required to conduct an evaluation of the differences between various preferences to determine and ensure that those preferences were, in fact, prudent.

60.     Practically speaking, prior to and throughout the Class Period, in the TDF market with limited options, a prudent plan fiduciary would always consider and compare, at a minimum, the Capital Group Target Retirement Series (also known as "American Funds"), the Vanguard Target Retirement Series, the T. Rowe Price Target Series, and the BlackRock LifePath Index series with any other potential TDF series because these have consistently outperformed most alternatives when evaluated by the prudent MPT process and are accordingly among the most often selected TDF options.

### c. Defendants' Failure to Follow a Prudent Process in Retaining the AC TDF Series

61.     Defendants retained the AC TDF from 2018 through at least the end of 2024.

62.     Defendants retained the AC TDF despite readily available then prevailing information (available both prior to and throughout the Class Period) which indicated dramatically inferior performance, investment manager metrics, and lower performance in risk adjusted metrics.

63.     In other words, examining the information available to the Fiduciaries in 2020, a fiduciary following the minimum standard of care for prudent investors, when evaluating whether to continue to retain the AC TDF series would have determined that its investment performance was inferior, its risk-adjusted performance was inferior, and that its glide path and investment

18

philosophy were being rejected by the data and the market, and thus removed the AC TDF by early 2020, at the latest.

64.     For example, for several years prior to and continuing throughout the Class Period, the AC TDF has consistently underperformed other target date series options and the alternatives that AC used as a benchmark themselves.[11]

65.     Specifically, under the circumstances prevailing in 2020, when confronted with the information that the AC TDF at the end of 2018 and 2019 had consistently underperformed in 3- and 5-year returns as well as MPT manager, risk, and cost metrics, a prudent fiduciary following the standard of care for prudent investors would not have decided to continue to retain the AC TDF throughout 2020.

66.     Figure 3 below provides a summary of 3- and 5-year investment returns and metrics underperformance compared to industry leading available alternative target date series (described in more detail below) in 2018 and 2019. Over those two years, available data showed that AC TDF underperformed in 3- and 5-year lookback metrics against four industry leading TDFs in 96% of time periods in available data. The AC TDF therefore consistently underperformed for 6 years by the end of 2019 across all metrics (just prior to the start of the Class Period).

---

[11] It is worth noting that for some period of time prior to and at least through October 7, 2024, AC compared their TDF series to the American Funds TDF in their marketing materials on their website. *See* https://web.archive.org/web/20241012082448/https://www.americancentury.com/advisors/client-conversations/target-date-solutions/one-choice-target-date-portfolios/ (last accessed March 20, 2026). As of March 20, 2026, however, they have removed that comparison and now compare to a Fidelity series. *See* https://www.americancentury.com/advisors/client-conversations/target-date-solutions/one-choice-target-date-portfolios/ (last accessed March 20, 2026).

**Figure 3**

**Performance Metrics Comparison Summary January 2018 - December 2019**

| Metric Analyzed | Total # of Metrics Analyzed Against Comparators | # of Metrics AC Underperformed | Percentage of Metrics AC Underperformed |
|---|---|---|---|
| 3 - Year Return | 55 | 55 | 100% |
| 5 - Year Return | 48 | 48 | 100% |
| Sharpe Ratio - 3 - Year | 55 | 55 | 100% |
| Sharpe Ratio - 5 - Year | 48 | 40 | 83% |
| Information Ratio 3 - Year | 55 | 54 | 98% |
| Information Ratio 5 - Year | 48 | 48 | 100% |
| Alpha 3 - Year | 55 | 50 | 91% |
| Alpha 5 - Year | 48 | 48 | 100% |
| Sortino Ratio - 3 - Year | 55 | 55 | 100% |
| Sortino Ratio - 5 - Year | 48 | 42 | 88% |
| Batting Average 3 - Year | 55 | 45 | 82% |
| Batting Average 5 - Year | 48 | 45 | 94% |
| Turnover Ratio | 56 | 46 | 82% |
| **Total** | **730** | **687** | **94%** |

67.     Given AC TDF's underperformance in 687 out of 730 (94%) of reviewed time periods for each metric[12] examining 3- and 5-year lookbacks, the Fiduciaries had no reason to expect AC TDF to improve or outperform during the Class Period starting in 2020. Unsurprisingly, failure to remove AC TDF in 2020 based on this information resulted in millions of dollars of harm to the Plan. Figure 4 below calculates approximate losses to the Plan incurred due to Defendants' failure to replace the AC TDF with a more prudently selected and investable comparator TDFs.

---

[12] Each Representing the total number of available data points for each metric analyzed from January 2018 through December 2019.

20

**Figure 4**

**Approximate Performance Losses January 2020 - December 2024**

| Target Date Series Name | AC's Approximate Performance Losses ($) vs. Comparators |
|---|---|
| Capital American Target Date Retirement Series R5E | -$8,480,975 |
| Vanguard Target Retirement Series Inv | -$5,069,977 |
| T. Rowe Price Target Series Inv | -$3,468,632 |
| BlackRock LifePath Index Instl | -$4,489,534 |

68. A prudent fiduciary following the standard of care under the circumstances then prevailing in 2020 (including the examination of 2018 and 2019 3- and 5-year lookback data) would have evaluated the AC TDF series against, at a minimum, the investable market-leading TDF benchmarks identified above, under the MPT accepted investment metrics set forth below and, regardless of which combination of reasonable benchmarks and metrics chosen, a fiduciary acting under the prudent investor standard under the circumstances then prevailing in 2020, **could not have concluded that it was prudent to continue to retain the AC TDF series** unless they employed a flawed process.

69. Similarly, the table below illustrates that the details of the AC TDF series underperformance[13] when evaluated using several investment metrics that are commonly used, accepted, and required by MPT and the Prudent Investor Standard. Using these commonly accepted and required metrics for comparison demonstrates that a prudent process would have revealed that the AC TDF series consistently underperformed under all metrics, removed it in early 2020, and avoided the harm caused to the Plan.

70. A prudent process would have also removed the AC TDF prior to the Class Period, but at the latest, and more relevant to this action, in 2020. Every subsequent month, quarter, or

---

[13] "Underperformance" in this context includes both commonly accepted investment manager metrics as well as the investment returns.

year that the Fiduciaries failed to remove this option was a result of imprudence because the AC TDF series underperformed a shocking 94% of commonly accepted MPT metrics of 3- and 5-year lookbacks in 2020[14].

71.     In fact, by the end of 2018 it would have been evident to a prudent process that under the circumstances then prevailing, the available information revealed that across all categories of metrics, whether return/performance metrics, risk-adjusted performance metrics, fee metrics, and others, the AC TDF provided no advantages over its peers.

72.     In 2020 the picture was no different.  As set forth below, the available data and information in 2020 mandates a conclusion that a prudent fiduciary examining AC TDF past performance would have removed the AC TDF from the Plan by 2020 at the latest.  The Plan Fiduciaries' failure to do so necessitates an inference that they employed an imprudent process for several years.

73.     These facts also necessitate the further inference that regardless of whether Defendants weighed one category of MPT metrics over another, all available information at the time required them to remove the AC TDF and select a better performing TDF alternative.

74.     Nevertheless from 2018 through 2024, Defendants failed to eliminate the AC TDF series from the plan, retaining at least 56% of the Plan's assets in the demonstrably underperforming and imprudent AC TDF from 2020 through 2024.

75.     Fiduciaries following a prudent process would not have ignored AC TDF's underperformance across all types of metrics as compared to better available options. This is further emphasized by the fact that **the comparator TDFs are established industry leaders**, and among the top 5 most selected options that any prudent fiduciary would be aware of and would

---

[14] The most relevant available information back in 2020 was 2019 and 2018 lookback performance.

compare their selected TDF against. In other words, Plaintiffs did not cherry pick fringe or unproven peers for comparison.

76. A prudent process would have uncovered AC TDF's poor performance against established peers.

77. The tables in Figures 5-8 below illustrate an analysis of the majority of the most important and commonly accepted investment performance metrics incorporated into the Prudent Investor Standard when comparing the AC TDF series to other available alternatives on an annual basis.

78. Each column of each table represents the circumstances at the end of each calendar year that the Plan Fiduciaries would have had available to them, and should have used to compare the AC TDF series to meaningful and available alternative series had they employed a prudent process to determine whether to retain the AC TDF series.

79. For each metric comparison, if the AC TDF series underperformed more than 50% of the time, the metric is highlighted in red. If, as is rarely the case, the AC TDF series metric underperformed less than 50% of the time, the metric is highlighted in green and if the metric is unavailable, it is left blank.

80. As illustrated in Figure 5 below, when compared on a TDF series-to-series basis, the AC TDF series underperformed the American Funds Target Date series under all metrics looking back 3- and 5-years. The chart below demonstrates that in 2020, if the Fiduciaries reviewed AC TDF's performance looking back 3- and 5-years across MPT metrics at the end of 2019 and 2020, they would have found that the AC TDF underperformed 100% of the time each year under each metric, except 86% in 3-year Batting Average in 2019.

**Figure 5**

American Century One Choice Series I vs Capital
American Target Date Retirement Series R5E:
Percentage of Metrics AC Underperformed

|  | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | 100% | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | 100% | 100% | 100% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | 100% | 100% | 100% |
| Alpha 3 - Year | 100% | 100% | 100% |
| Alpha 5 - Year | 100% | 100% | 100% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | 100% | 100% | 100% |
| Batting Average 3 - Year | 100% | 86% | 93% |
| Batting Average 5 - Year | 100% | 100% | 100% |
| Turnover Ratio | 100% | 100% | 100% |

81.     Similarly, as shown in Figure 6, when compared on a series-to-series basis, the AC TDF series underperformed the T. Rowe Price Target Date Series ("TRP") under all metrics looking back 3- and 5-years, except Turnover Ratio in 2018 and three-year Batting Average in 2019.

24

**Figure 6**

**American Century One Choice Series I vs T. Rowe Price Target Series Inv: Percentage of Metrics AC Underperformed**

|  | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | 100% | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | 100% | 100% | 100% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | 100% | 100% | 100% |
| Alpha 3 - Year | 100% | 100% | 100% |
| Alpha 5 - Year | 100% | 100% | 100% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | 100% | 100% | 100% |
| Batting Average 3 - Year | 100% | 14% | 57% |
| Batting Average 5 - Year | 67% | 100% | 83% |
| Turnover Ratio | 0% | 71% | 36% |

82.    Likewise, the AC TDF series underperformed the Vanguard Target Retirement Series ("Vanguard") under all metrics looking back 3- and 5-years from the end of 2018 and 2019, except 2018 5- year Sharpe Ratio.

**Figure 7**

**American Century One Choice Series I vs Vanguard Target Retirement Series Inv: Percentage of Metrics AC Underperformed**

| | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | 100% | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | 33% | 100% | 67% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | 100% | 100% | 100% |
| Alpha 3 - Year | 100% | 86% | 93% |
| Alpha 5 - Year | 100% | 100% | 100% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | 50% | 100% | 75% |
| Batting Average 3 - Year | 100% | 57% | 79% |
| Batting Average 5 - Year | 100% | 83% | 92% |
| Turnover Ratio | 100% | 100% | 100% |

83.     In that same vein, the AC TDF series underperformed the BlackRock LifePath Index Target Retirement Series ("BlackRock") under all metrics looking back 3- and 5-years from the end of 2018 and 2019, except 2018 5-year Sharpe Ratio.

**Figure 8**

### American Century One Choice Series I vs BlackRock LifePath Index Instl: Percentage of Metrics AC Underperformed

|  | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | 100% | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | 33% | 100% | 67% |
| Information Ratio 3 - Year | 83% | 100% | 92% |
| Information Ratio 5 - Year | 100% | 100% | 100% |
| Alpha 3 - Year | 50% | 86% | 69% |
| Alpha 5 - Year | 100% | 100% | 100% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | 50% | 100% | 75% |
| Batting Average 3 - Year | 100% | 100% | 100% |
| Batting Average 5 - Year | 100% | 100% | 100% |
| Turnover Ratio | 86% | 100% | 93% |

84.     A prudent fiduciary examining the AC TDF in 2020, under the circumstances then prevailing, would have recognized this dramatic level of underperformance compared to industry leading available alternatives, considered it holistically under accepted MPT metrics, and removed the AC TDF in 2020.

85.     In other words, prudent fiduciaries utilizing a prudent process incorporating commonly accepted performance evaluation metrics required by MPT would not have retained the AC TDF series in 2020.

86.     Ultimately a prudent process would have evaluated the retention of the selected AC TDF in relation to at least the available industry leading alternatives.  Such a comparison would have revealed only one prudent choice: to remove the AC TDF in 2020 because it provided no advantages against available alternatives in 3- and 5-year lookbacks in multiple years. Defendants' failure to do so raises the inference that Defendants did not employ a prudent process in selecting and monitoring their TDFs.

27

**VINTAGE-TO-VINTAGE COMPARISON**

87.    As outlined above, a prudent fiduciary examining the AC TDF in 2020 (under the circumstances then prevailing) would not have continued to retain the AC TDF in light of the dramatic level of underperformance compared to industry leading available alternatives on a series to series basis.

88.    But while the results of the series-level comparisons make clear that conducting a vintage-to-vintage comparison would likely also reveal significant underperformance, a prudent fiduciary would have nonetheless completed a vintage-to-vintage comparison as well to confirm.

89.    Unsurprisingly, the vintage-to-vintage comparison likewise would have illustrated the AC TDF's substantial underperformance under the circumstances then prevailing in 2020 (2018 and 2019 data).

90.    Each of the comparable AC TDF series vintages also underperformed when evaluated by the commonly accepted MPT metrics (Sharpe, Sortino, Alpha, etc.).

91.    Appendix A to this complaint sets forth the comparison of every comparable vintage of the AC TDF series to the same vintage for available industry leading alternative TDF series options, broken down by performance as compared to the commonly accepted MPT metrics.

92.    The standard of care for selection and monitoring investments for a plan the size of the Plan would require quarterly reviews of the investment performance of selected options. Accordingly, the Plan Fiduciaries would have had a minimum of four opportunities (each quarter in 2019) to remove the AC TDF series based on the 2018 performance and by the Q1 2020 quarterly meeting the Plan Fiduciaries would have had metrics for all of 2018 and 2019 providing the absolute latest time by which the AC TDF series should have been removed.

93. For each AC TDF vintage, the tables in Appendix A provide the investment metrics identified throughout this complaint for the two years immediately preceding the Class Period, which was the most up to date data available to the fiduciaries in 2020. If the AC TDF series vintage underperformed, then the metric is highlighted in red. If the AC TDF series vintage outperformed, the metric is highlighted in green, and ties are left white. When data is not available the space is left blank. The 2030 vintage comparison against American Funds from Appendix A is set forth below as Figure 10.

**Figure 9**

### American Century One Choice 2030 I

| ARCSX | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 4.71% | 8.56% |
| 5 - Year Return | 4.02% | 6.16% |
| Sharpe Ratio - 3 - Year | 0.564 | 0.980 |
| Sharpe Ratio - 5 - Year | 0.522 | 0.732 |
| Information Ratio 3 - Year | -0.937 | -0.375 |
| Information Ratio 5 - Year | -0.146 | -0.695 |
| Alpha 3 - Year | -0.53% | -0.03% |
| Alpha 5 - Year | 0.03% | -0.27% |
| Sortino Ratio - 3 - Year | 0.777 | 1.453 |
| Sortino Ratio - 5 - Year | 0.766 | 1.126 |
| Batting Average 3 - Year | 0.361 | 0.417 |
| Batting Average 5 - Year | 0.483 | 0.433 |
| Turnover Ratio | 16.00 | 20.00 |

94. Figure 11, below, provides the investment metrics for the comparable vintage benchmark and, as above, if the comparable vintage benchmark outperformed the AC TDF series benchmark, then the metric is highlighted in green, with underperformance highlighted in red and ties left white. The 2030 vintage comparison against American Funds from Appendix A is set forth below.

29

**Figure 10**

### American Funds 2030 Trgt Date Retire R5E

| RHETX | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 6.74% | 10.71% |
| 5 - Year Return | 5.50% | 7.94% |
| Sharpe Ratio - 3 - Year | 0.754 | 1.142 |
| Sharpe Ratio - 5 - Year | 0.624 | 0.839 |
| Information Ratio 3 - Year | 0.733 | 0.813 |
| Information Ratio 5 - Year | 0.746 | 0.499 |
| Alpha 3 - Year | 0.95% | 1.47% |
| Alpha 5 - Year | 0.85% | 0.65% |
| Sortino Ratio - 3 - Year | 1.098 | 1.734 |
| Sortino Ratio - 5 - Year | 0.962 | 1.325 |
| Batting Average 3 - Year | 0.611 | 0.583 |
| Batting Average 5 - Year | 0.583 | 0.567 |
| Turnover Ratio | 8.00 | 0.00 |

95.      And finally, Figure 12 provides the difference for each performance metric, with AC TDF series vintage underperformance highlighted in red, outperformance in green, and ties left white. The 2030 vintage comparison against American Funds from Appendix A is set forth therein.

**Figure 11**

### American Century One Choice 2030 I & American Funds 2030 Trgt Date Retire R5E Comparison

| | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 2.03% | 2.16% |
| 5 - Year Return | 1.48% | 1.78% |
| Sharpe Ratio - 3 - Year | 0.190 | 0.162 |
| Sharpe Ratio - 5 - Year | 0.102 | 0.107 |
| Information Ratio 3 - Year | 1.670 | 1.188 |
| Information Ratio 5 - Year | 0.892 | 1.194 |
| Alpha 3 - Year | 1.47% | 1.50% |
| Alpha 5 - Year | 0.82% | 0.92% |
| Sortino Ratio - 3 - Year | 0.321 | 0.280 |
| Sortino Ratio - 5 - Year | 0.197 | 0.198 |
| Batting Average 3 - Year | 0.250 | 0.167 |
| Batting Average 5 - Year | 0.100 | 0.133 |
| Turnover Ratio | -8.00 | -20.00 |
| # of Underperforming Metrics | 13 | 13 |
| # of Total Metrics | 13 | 13 |
| % of Underperforming Metrics | **100%** | **100%** |

30

96.     As the 2030 comparison example demonstrates, AC TDF 2030 underperformed the American Funds 2030 in all metrics in both 2018 and 2019, which represents the data available to the Fiduciaries in 2020.

97.     Appendix A to this complaint provides the same charts demonstrating underperformance across the industry-leading comparator TDFs across the 2030-2060 vintages.

98.     Thus, a fiduciary following a prudent process would have reviewed at least all the pleaded information in 2020 and would have determined that it was imprudent to continue to retain the AC TDF series and removed it.

99.     Despite all the metrics and performance data imploring the Fiduciaries to remove the underperforming AC TDF series, the Plan Fiduciaries not only failed to remove the AC TDF series prior to the Class Period, but also in 2020, and retained it through at least the end of 2024.

100.    As a direct result of this conduct, the Plan participants have suffered investment losses of tens of millions of dollars.

## CLASS ACTION ALLEGATIONS

101.    Plaintiff brings this action on behalf of Plaintiff and the Class, which is defined as participants in and beneficiaries of the Plan but excluding Defendants; any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of any Defendant or is or was a partner, officer, director, or controlling person of any Defendant; the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of any Defendant; Plaintiff's counsel; judges of the Court in which this case is pending and their current spouse and children; and the legal representatives, heirs, successors and assigns of any such excluded person.

102.    The Class Period includes the six years prior to the date of the filing of this Complaint through the date of judgment.

31

103. The members of the Class are so numerous, consisting of thousands of members, not including their spouse beneficiaries, who, upon information and belief, are sufficiently dispersed geographically such that joinder of all members is impracticable. The issues of liability are common to all members of the Class and are suitable to common resolution.

104. Plaintiff's claims are typical of the claims of other members of the Class because their claims arise from the same events, practices and/or courses of conduct described above.

105. Plaintiff's claims are also typical of the claims of other members of the Class because the relief sought consists of requiring Defendants to make the Plan whole for any losses caused by their fiduciary breaches and to disgorge their profits to the Plan. Any such recovery from Defendants will be paid to the Plan and any relief will flow to all Class Members through their accounts in the Plan.

106. Plaintiff will fairly and adequately represent and protect the interests of the Class.

107. Plaintiff does not have any interests antagonistic to or in conflict with those of the Class.

108. Defendants have no unique defenses against Plaintiff that would interfere with Plaintiff's representation of the Class.

109. Plaintiff is represented by counsel experienced in prosecuting ERISA class actions and with particular experience and expertise in litigation involving ERISA breaches of fiduciary duty.

110. The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. This action challenges whether Defendants acted consistently with their obligations under ERISA as to the Plan as a

whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

111.    The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants fulfilled their fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

112.    The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to the Class as a whole. This action challenges whether Defendants breached their fiduciary duties, which would be violations of ERISA as to the Plan as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants breached their fiduciary duties. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly from the declaratory or injunctive relief or flow as a necessary consequence of that relief.

113.    The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants breached their fiduciary duties to the Plan. As the members of the Class were participants in that Plan, their accounts were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf

33

of the Plan, common questions as to remedies and damages will likewise predominate over any individual issues.

114.    A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the Plan.

115.    Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### PLAN-WIDE RELIEF

116.    ERISA authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a). See 29 U.S.C. § 1132(a)(2).

117.    Indeed, ERISA breach-of-fiduciary duty actions generally hinge on the uniform conduct of plan fiduciaries with respect to the plan. *Hughes v. Nw. Univ.*, 595 U.S. 170, 176-77 (2022).

118.    Plaintiff here seeks relief on behalf of the Plan, i.e., in this case for all losses to the Plan caused by Defendants' breaches, and not only the losses to Plaintiff's individual account.

### TIMELINESS

34

119. Within the six-year period prior to Plaintiff's filing this suit, Defendants violated one or more of their fiduciary obligations as described above.

120. At all relevant times during the Class Period, Defendants also made affirmative misrepresentations to participants about the security of their investments, the competence of the portfolio fund managers, the performance history of their investments, and the amount of investment fees they were being charged.

121. At all relevant times during the Class Period, Defendants intentionally concealed their fiduciary breaches to prevent Plan participants from discovering them and avoiding the need to cure the deficiencies.

122. Plaintiff did not acquire actual knowledge of these violations until shortly before commencing this action. Consequently, Plaintiff's claims in this action are timely under 29 U.S.C. § 1113.

### COUNT I: Breach of Fiduciary Duty of Prudence
### (Against All Defendants)

123. Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

124. At all relevant times, the Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar as they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets. 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

125. ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments. 29 U.S.C. § 1104(a)(1)(B).

126. During the Class Period, Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan prudently and act with the care, skill, diligence, and prudence required by ERISA.

127. At all relevant times during the Class Period, Defendants breached their fiduciary duties of prudence in multiple respects by selecting and continuing to retain a severely underperforming TDF option across all metrics instead of removing it in favor of better and available options.

128. Based on reasonable inferences from the facts set forth in this Complaint, Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess before and during the Class Period whether the Plan's AC TDF was a prudent choice for the Plan and to remove imprudent investment options regardless of how long those investments had been in the Plan.

129. During the Class Period, Defendants breached their fiduciary duties of prudence to Plan participants, including Plaintiff, by failing to engage in a prudent fiduciary process for monitoring the Plan's TDF and by failing to remove the imprudent AC TDF investment within a reasonable period.

130. Defendants were directly responsible for: evaluating and monitoring the Plan's investment options, including the AC TDF, in a prudent fashion; eliminating funds, such as the AC TDF, that underperformed under all metrics; and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

131. Defendants failed to employ a prudent fiduciary process by failing to monitor and evaluate the AC TDF in comparison to other meaningful benchmark TDFs.

132.    Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their fiduciary duties of prudence under 29 U.S.C. § 1104(a)(1)(B).

133.    As a result of the Defendants' breach of their fiduciary duty of prudence with respect to the Plan, Plaintiffs and Plan participants suffered millions of dollars in unreasonable and unnecessary monetary losses.

134.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the fiduciary breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breach of fiduciary duty alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

**COUNT II: Failure to Adequately Monitor Other Fiduciaries under ERISA**
**(against the Company)**

135.    Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

136.    The Company had the authority to appoint and remove members or individuals responsible for Plan investment management and was aware that these fiduciaries had critical responsibilities for the Plan.

137.    In light of this authority, the Company had a duty to monitor those individuals responsible for Plan investment management to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

138.    The Company had a duty to ensure that the individuals responsible for Plan investment management possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

a. The Company breached its duty to monitor individuals responsible for Plan investment management, by, among other things: Failing to monitor and evaluate the performance of individuals responsible for Plan investment management or have a system in place for doing so, standing idly by as the Plan suffered significant losses by maintaining the imprudent AC TDF for most of the Class Period;

b. Failing to monitor the process by which Plan TDF were evaluated, failing to investigate the suitability of the AC TDF based on failing to investigate the availability of alternative, prudent TDF; and

c. Failing to remove individuals responsible for Plan investment management whose performance was inadequate in that they continued to maintain the AC TDFs, all to the detriment of the Plan and Plan participants' retirement savings.

139.    As a result of the foregoing breaches of the duty to monitor, Plaintiff and Plan participants suffered unreasonable and unnecessary monetary losses amounting to millions of dollars.

140.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor individuals responsible for Plan investment management. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

Wherefore Plaintiff prays that judgment be entered against Defendants on all claims, and requests that the Court order or award the following relief:

A. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint the Plaintiff as class representative, and appoint the firm Milberg, PLLC as class counsel;

B. Order Defendants to disgorge any profits they received as a result of the above breaches of fiduciary duty;

C. Impose a constructive trust over these profits;

D. Impose a monetary surcharge against Defendants and compel Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets in the AC TDFs, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Plan participants would have made if the Defendants had fulfilled their fiduciary obligations by undertaking TDF suitability and comparative analyses on a timely basis;

E. Apportion all amounts recovered for the Plan among the Plaintiff and the Class;

F. Order that any amount to be paid to the Plan and/or accounts of Plaintiff and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability;

G. Require Defendants to pay attorneys' fees and the costs of this action pursuant to 29 U.S.C. § 1132(g)(1), or order the payment of reasonable fees and expenses to Plaintiff's counsel on the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class in this action;

H. Award pre-judgment and post-judgment interest;

I. Award any other such relief the Court determines Plaintiff and the Class are entitled to pursuant to 29 U.S.C. § 1132(a);

J. Award such other relief as the Court may deem just and proper;

DATED: March 20, 2026          Respectfully submitted,

*/s/Mariya Weekes*
Mariya Weekes (MA Bar No. 32052)
**MILBERG, PLLC**
333 SE 2nd Avenue, Suite 2000
Miami, FL 33131
Tel: (786) 206-9057
Email: mweekes@milberg.com


John Hughes*
**MILBERG, PLLC**
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
Jhughes@milberg.com

*Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiff and
the Prospective Class*